SENTENCIA
Por medio del presente recurso se nos solicita revisar el dictamen del Tribunal de Apelaciones, el cual revocó la sentencia dictada por el Tribunal de Primera Instancia. Este último declaró “ha lugar” una acción sobre despido ilegal presentada por el aquí peticionario, Sr. Heberto Morales Bengochea, al amparo de la Ley Núm. 80 de 30 de mayo de 1976, de la Ley Núm. 44 de 2 de julio de 1985, del “American with Dissabilities Act” (Ley ADA), 42 U.S.C.A. see. 12101 y de la Ley Núm. 45 de 18 de abril de 1935, y una acción por daños y perjuicios al amparo del Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 5141.
*743 El peticionario, Sr. Heberto Morales Bengochea (señor Morales), laboró como empleado a tiempo indeterminado desde 1981 hasta 1996, en el área de pagador-receptor en una sucursal del Banco Popular de Puerto Rico (BPPR) localizada en Barrio Obrero.
El 26 de abril de 1985 el señor Morales presenció un asalto ocurrido en el área de pagador-receptor a su cargo. A partir de este incidente, comenzó a padecer episodios de asfixia y ansiedad. En un principio atribuyó estos síntomas a alguna condición fisiológica o respiratoria, por lo que buscó atención médica de generalistas.(1) Sin embargo, no se le diagnosticó condición física alguna que causara los síntomas expresados, hasta que finalmente fue referido a un médico siquiatra.
En 1985 fue atendido por el doctor Juan G. Soto Silva, médico siquiatra, quien posteriormente lo refirió al Dr. Carlos E. Ifarragueri (doctor Ifarraguerri), médico siquia-tra, con quien el señor Morales se atendió hasta 1994.(2)
En 1986 el señor Morales dirigió una misiva al BPPR en la que notificó la condición que estaba padeciendo y, a su vez, solicitó ser trasladado a otra sucursal por razones de salud. Dicha petición no le fue concedida.
Así las cosas, el señor Morales continuó bajo trata-miento psiquiátrico privado, el cual consistía principal- *744 mente en terapias y medicamentos(3) Tres años después, peticionó nuevamente al BPPR un cambio de posición como pagador-receptor y explicó que, las evaluaciones médicas reflejaron que el manejo de dinero y personal de un. modo directo le producía mucha ansiedad.
Constan en el expediente del señor Morales varias cer-tificaciones médicas dirigidas al BPPR y emitidas por su médico de cabecera, el doctor Ifarraguerri. Entre ellas, una evaluación realizada el 30 de junio de 1994, en la cual el doctor Ifarraguerri indicó que éste padecía de una depre-sión aguda con ansiedad severa y episodios de pánico. A su vez, recomendó que se ausentara de su trabajo por diez días.(4) Posteriormente, expidió otro certificado médico en el que indicó que, como consecuencia de su condición, la capacidad del señor Morales para tolerar estrés estaba muy limitada. En esta ocasión, recomendó un descanso por dos semanas y que fuese reasignado a realizar una tarea diferente a las que actualmente desempeñaba como pagador-receptor. Finalmente, el doctor Ifarraguerri reco-mendó que se mantuviera sin trabajar temporeramente hasta el 3 de octubre de 1994. Esta vez enfatizó que consi-deraba que no debía desempeñarse en áreas donde el riesgo de asaltos fuese muy alto y donde la tarea asignada fuera el manejo de dinero en efectivo.(5)
El 16 de agosto de 1994 el señor Morales acudió a la Corporación del Fondo del Seguro del Estado (FSE), donde alegó que había quedado emocionalmente afectado como consecuencia del asalto ocurrido en la sucursal del BPPR donde trabajaba. Luego de la correspondiente evaluación, el FSE determinó que el expediente médico del señor Morales demostró una relación causal entre el accidente de trabajo y su condición. De esta manera concedió al señor *745 Morales los beneficios por accidente ocurrido en el empleo y recomendó al. señor Morales tratamiento en descanso con su médico privado, el doctor Ifarraguerri.(6)
Durante este tiempo de descanso concedido por el FSE, el señor Morales envió una comunicación escrita a la Sra. Janet Ibern, especialista de la División Recursos Humanos del BPPR, en la que solicitó un cambio de tareas como aco-modo razonable al amparo de la ley federal conocida como “American with Disabilities Act”.
El 1 de noviembre de 1994 el FSE autorizó al señor Morales a trabajar, pero sujeto a continuar el tratamiento si-quiátrico con su médico de cabecera. Conforme a la deci-sión del FSE, el señor Morales se presentó a trabajar, pero sostuvo que no podía realizar las labores de . pagador-receptor. Así las cosas, la Sra. Carmen Chary Piñeiro Díaz, oficial de reclutamiento de la División de Recursos Huma-nos del BPPR, dirigió una carta al Administrador del FSE señalando que no le. era posible ofrecer acomodo razonable al señor Morales, ya que no tenían un puesto disponible en ese momento. (7)
El 8 de diciembre de 1994 el Sr. Héctor Rivera Ostalaza, especialista en rehabilitación del FSE de la región de San *746 Juan, examinó al señor Morales y certificó que su condi-ción emocional le impedía trabajar como pagador-receptor. Asimismo rindió un informe en el cual indicó que el señor Morales, no estaba capacitado para retornar a su trabajo habitual, ya que tenía limitaciones sustanciales y perma-nentes para realizar las tareas del puesto de pagador-receptor. No obstante, solicitó la reubicación del señor Morales en un área donde no tuviese contacto con dinero y personal directo.(8)
A finales de 1994 el BPPR le requirió al señor Morales que gestionase los beneficios por incapacidad a largo plazo del Seguro Social. (9) Inconforme con este curso de acción, el señor Morales manifestó al BPPR su desacuerdo y expresó que no consideraba que su incapacidad requiriera la solici-tud de dichos beneficios, ya que podía desempeñarse sin problemas en otras áreas de trabajo. Ante esto, el BPPR le indicó que debía solicitarlos como parte del proceso que estaba llevándose a cabo.(10)
Finalmente, los beneficios por incapacidad del Seguro Social le fueron denegados, ya que se determinó que a pe-sar de su condición nerviosa, el señor Morales podía reali-zar otro tipo de trabajo.(11)
El 12 de junio de 1995 el FSE dio de alta al señor Morales, con un diagnóstico final de incapacidad parcial permanente. (12)
*747 El señor Morales continuó trabajando con dificultad hasta que el 20 de junio de 1995 tuvo que ser atendido por el Dr. Juan G. Soto Silva. Dicho médico certificó que el señor Morales no estaba capacitado para reintegrarse a trabajar con público ni en lugares que revivieran la expe-riencia del asalto.
A solicitud del BPPR, el Dr. Israel Ganapolsky, examinó al señor Morales y confirmó su incapacidad para trabajar en el área de pagador-receptor.(13) Sin embargo, el señor Morales no fue reubicado y continuó trabajando como pagador-receptor. No obstante, reiteró al BPPR su solicitud de acomodo razonable.
El 21 de junio de 1995, por orden de sus supervisores inmediatos, se le requirió al señor Morales asistir a un adiestramiento de personal dirigido a los empleados de las áreas de pagador-receptor. (14) Surge del testimonio de la Sra. Carmen Rivera, instructora a cargo del adiestra-miento, que al señor Morales se le ordenó que se marchara antes de éste finalizar. Esta decisión se basó en las cons- *748 tantes interrupciones que alegadamente ocasionó con sali-das al baño y comentarios negativos.
Luego, el BPPR le comunicó verbalmente que, debido a que precisaban de más tiempo para el acomodo razonable, le otorgarían una licencia sin sueldo.
Ante este panorama, el señor Morales contrató los ser-vicios del Lie. Víctor M. Bermúdez Pérez (licenciado Ber-mudez),-, quien mediante cartas dirigidas al BPPR, solicitó el acomodo razonable para su cliente. En cartas, subsi-guientes advirtió al BPPR que la negativa injustificada para conceder el acomodo razonable constituía una viola-ción a las leyes laborales locales y federales.
La situación de inestabilidad e incertidumbre respecto a la reubicación del señor Morales en su trabajo produjo que su condición nerviosa se agravara. Como consecuencia, éste fue ingresado desde el 9 de agosto de 1995 hasta el 22 de agosto de 1995 en la institución siquiátrica First Hospital Panamericano.
Una vez dado de alta, el señor Morales acudió al FSE donde le indicaron que el BPPR, a través de la Lie. Emily Arean Díaz, vicepresidenta auxiliar de la División de Re-cursos Humanos, había solicitado ante el FSÉ la reaper-tura del caso siquiátrico del señor Morales.
Durante estas fechas, específicamente en octubre de 1995, surgieron tres nuevas plazas en el BPPR, una como chofer y dos como representantes de servicios de telebanco. (15) Sin embargo, el señor Morales no fue consi-derado para ninguna de ellas(16) y continuó en licencia sin sueldo por aproximadamente seis (6) meses, hasta que fi-nalmente, el 14 de febrero de 1996, fue despedido.(17)
*749 El BPPR fundamentó su decisión en que éste nunca se comunicó con el personal del BPPR y adujo que el señor Morales había hecho caso omiso a las cartas cursadas a través de la Lie. Emily Arean.
A pesar de que fue un hecho probado en juicio que el BPPR fue notificado de que toda comunicación para el se-ñor Morales se haría viable por conducto de su represen-tante legal, el BPPR obvió el cauce legal en sus comunica-ciones y continúo remitiéndolas al señor Morales y a su esposa. No obstante, durante el período que el señor Morales estuvo suspendido por licencia sin sueldo, el licenciado Bermúdez mantuvo comunicación escrita con el BPPR para mantener a sus supervisores informados de la condi-ción del señor Morales.(18) Estas cartas dirigidas al BPPR por medio de la representación legal del señor Morales, constan en el expediente del empleado y fueron admitidas en evidencia por las partes.
El 6 de mayo de 1996 el señor Morales acudió ante el Tribunal de Primera Instancia y presentó una demanda contra el BPPR sobre entredicho provisional, preliminar y permanente, y daños y perjuicios, al amparo de la Ley Núm. 44 de 2 de julio de 1985,(19) que prohíbe el discrimen contra impedidos, la Ley ADA, supra, la Ley de Compen-saciones por Accidentes de Trabajo, Ley Núm. 45 de 18 de abril de 1935, .según enmendada,(20) la Ley Núm. 80 de 30 de mayo de 1976,(21) y una acción en daños y peijuicios al amparo del Art. 1802 de nuestro Código Civil, supra.
*750 Alegó, entre otras cosas, que el BPPR se negó a pro-veerle acomodo razonable a pesar de las solicitudes presen-tadas y de las recomendaciones de sus facultativos médi-cos, que se le había negado su derecho a reinstalación conforme a la Ley Núm. 45 y que había sido objeto de un despido injustificado y discriminatorio.
Luego de varios incidentes procesales, el BPPR presentó ante el Tribunal de Primera Instancia una moción de sen-tencia sumaria en la que solicitó la desestimación de las causas de acción incoadas por el señor Morales. En sínte-sis, alegó que el señor Morales no era una persona con impedimento según lo dispuesto en la Ley Núm. 44 y en la Ley ADA. Adujo, además, que no cumplía con los requisitos del Art. 5-A de la Ley Núm. 45 (11 L.P.R.A. see. 7). El Tribunal de Primera Instancia acogió la sentencia sumaria y desestimó la causa de acción del señor Morales.
De esta determinación, el señor Morales acudió ante el Tribunal de Apelaciones mediante un recurso de apelación. (22) Dicho foro revocó la sentencia sumaria dic-tada por el foro de instancia y ordenó la celebración del juicio correspondiente.
Concluidos los procedimientos pertinentes, el 19 de oc-tubre de 2004 el Tribunal de Primera Instancia concluyó que el BPPR no tenía justa causa para despedir al señor Morales. En consecuencia, condenó al BPPR a pagar el do-ble de los salarios dejados de percibir por el señor Morales durante el período de despido ilegal. Además, ordenó el pago de $50,000 por angustias mentales y daños morales.
El 3 de noviembre de 2003 el señor Morales presentó una solicitud de reconsideración o enmienda de sentencia, mientras que el BPPR presentó una solicitud de “Determi-naciones de Hecho y Reconsideración”.
El 19 de octubre de 2004 el Tribunal de Primera Instan-cia emitió una sentencia enmendada en la que concluyó que el despido del señor Morales fue contrario a las Leyes *751 Núm. 80 y Núm. 45, y ordenó la reinstalación del señor Morales.
No conforme con dicho dictamen, el BPPR, acudió al Tribunal de Apelaciones. En síntesis, alegó que el foro de pri-mera instancia erró al negarse a formular las “Determina-ciones de hechos adicionales” y al concluir que, conforme a la Ley Núm.80, el despido fue injustificado. Señaló, ade-más, que dicho foro erró al determinar que el señor Morales era una persona con impedimentos de acuerdo con la Ley ADA y que, aún en el caso que así fuera, dicho foro incidió al decidir que el BPPR violó su obligación de pro-veer acomodo razonable. Por último, BPPR argüyó que tanto el remedio de reinstalación del señor Morales como la concesión de salarios dejados de percibir por éste al mo-mento de su despido, eran improcedentes ya que, para esa fecha, el señor Morales se encontraba disfrutando de una licencia sin sueldo y no estaba capacitado para desempe-ñar las funciones de su posición.
El 21 de septiembre de 2005 el foro intermedio apelativo revocó la decisión del foro primario y desestimó en su tota-lidad la demanda presentada por el señor Morales contra el BPPR. Fundamentó su decisión en que la única limita-ción probada del señor Morales fue la de trabajar en las áreas de manejo de dinero e interacción con el público. Asi-mismo señaló que, por no ser una persona con impedimen-tos, no le asiste el derecho a un acomodo razonable, y que aún en el caso de que lo fuera, éste hizo caso omiso a la publicación de edictos sobre posiciones vacantes. Final-mente, el Tribunal de Apelaciones concluyó que el BPPR tuvo justa causa para el despido del señor Morales, ya que la prueba presentada demostró insubordinación y aban-dono de empleo por parte de éste.
Inconforme, el señor Morales presentó una oportuna re-consideración, la cual fue declarada “no ha lugar”. Por tal razón, acude ante nos, mediante un recurso de certiorari, alegando la comisión de los errores siguientes:
*752 Erró el Honorable Tribunal de Apelaciones al haber revocado la Sentencia emitida por el Tribunal de Primera Instancia sus-tituyéndose las determinaciones de hechos que emitiera dicho foro contenidas en la misma que a su vez estaban basadas en determinaciones de credibilidad.
Erró el Honorable Tribunal de Apelaciones al haber revocado al Honorable Tribunal de Primera Instancia al haberse susti-tuido las conclusiones de derecho que fueran ampliamente [fundamentadas] por el Honorable Tribunal de Primera Ins-tancia en la Sentencia revocada.
Incurrió en error el Honorable Tribunal de Apelaciones al ha-ber revocado al Tribunal de Primera Instancia al haber igno-rado consideraciones de política pública, así como principios básicos de hermenéutica aplicables a controversias que en-vuelven la interpretación de estatutos laborales. Petición de certiorari, pág. 6.
J — I
Modificamos la sentencia del Tribunal de Apelaciones del modo siguiente: se confirma en cuanto a que no proce-den las reclamaciones de autos al amparo de la Ley de Compensaciones por Accidentes de Trabajo, Ley Núm. 45, y la reclamación por violación a una legislación especial, y de violación al derecho a la intimidad por el Art. 1802 del Código Civil, supra. (23)
. En lo que respecta al despido discriminatorio conforme *753 a la Ley Núm. 44, y a la Ley ADA, revocamos la determi-nación del foro intermedio apelativo y confirmamos la de-cisión del Tribunal de Primera Instancia. De este modo, concedemos los remedios disponibles al amparo de la Ley Núm. 100 de 30 de junio de 1959.(24) Esto es, el doble de los salarios dejados de percibir, aumentos y beneficios margi-nales, luego de deducir cualquier suma que el trabajador hubiera percibido por su trabajo en ese período con otros patronos. Se computará esta cuantía desde el 14 de febrero de 1996, fecha de su despido, hasta el 3 de octubre de 2003, fecha en que el Tribunal de Primera Instancia dictó su sentencia.
En cuanto a la cantidad adicional concedida por hono-rarios de abogado, se modifica la determinación de dicho foro, para conceder la cantidad de 25% de la indemnización básica otorgada al empleado.

Devolvemos el presente caso al Tribunal de Primera Ins-tancia para que continúen los procedimientos en conformi-dad con lo aquí pautado.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente Señor Hernández Denton disintió de la Sentencia del Tribunal por entender que la decisión del Tribunal de Apelaciones es esencialmente correcta: Coincide con dicho foro en cuanto a que en las circunstancias particulares de este caso, el Sr. Herberto Morales Bengochea no tenía derecho a un acomodo razona-ble de acuerdo con la Ley del American with Dissabilities Act ni de la legislación que protege contra el despido injustificado. El Juez Asociado Señor Rivera Pérez emitió una opinión de conformidad. La Jueza Asociada Señora Ro-dríguez Rodríguez disintió sin opinión escrita.
(.Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

 Surge del expediente que los primeros médicos a los que acudió el señor Morales fueron: el doctor Zayas, médico generalista, y el Dr. Gary Montalvo, otorrinolaringólogo. Ambos confirmaron que sus síntomas no tenían una procedencia física.

 Transcripción de la Vista en su Fondo, Apéndice de la Petición de certiorari, 3ra pieza, págs. 797-987. El señor Morales recibió tratamiento de varios especialis-tas, como el doctor Juan Soto Silva, médico siquiatra, el Dr. Carlos E. Ifarraguerri, médico siquiatra, la Dra. Margarita Tello, médico e inspectora de Medicina Especia-lizada en el Fondo del Suguro del Estado (FSE), la Dra. Natividad Rodríguez, médico siquiatra del FSE, la Dra. Vilma Meléndez, médico generalista y coordinadora del área de condiciones emocionales del FSE, y el Dr. Juan A. Lastra Araeil, médico siquiatra del FSE.

 El señor Morales tenía que tomar cúmo parte de su tratamiento los psieofár-macos siguientes: Tranxene, Prozac y Restoril.

 Apéndice de la Petición de certiorari, 2da pieza, pág. 374.

 Apéndice de la Petición de certiorari, Ira pieza, pág. 34.

 Apéndice de la Petición de certiorari, Ira pieza, pág. 100. Cabe señalar que el FSE orientó al señor Morales sobre su derecho a acomodo razonable. La carta sus-crita por el Sr. Héctor Rivera Ostolaza, especialista en rehabilitación del FSE, reco-mendó lo siguiente:
“El Fondo del Seguro del Estado en su compromiso de servicio a patronos y lesionados, respetuosamente somete ante su consideración la recomendación de un acomodo razonable para el empleado Heberto Morales Bengochea ....
“De las evaluaciones médicas y del análisis ocupacional se desprende la necesi-dad de reubicar al empleado a otro escenario que no sea una sucursal, con tareas donde no esté expuesto a posibles asaltos, al manejo de valores en efectivo ni al contacto personal directo con el público.
“Se recomienda al patrono que evalúe en la Oficina de Recursos Humanos al-ternativas ocupacionales compatibles con las limitaciones emocionales de este empleado. Le solicitamos que el caso sea evaluado a tono con los procedimientos administrativos del Banco Popular y en armonía con la legislación estatal y federal para las personas con impedimentos que tienen potencial para continuar siendo pro-ductivos en el trabajo.” (Enfasis suplido.) Petición de certiorari, Ira pieza, pág. 108.

 Carta dirigida al Lie. Pedro Soto Ríos, administrador del FSE, Región de San Juan. Apéndice de la Petición de certiorari, Ira pieza, pág. 104.

 Íd.

 Transcripción escrita de la vista en su fondo, Apéndice de la Petición de certiorari, 3ra pieza, pág. 849. Véase, además, Apéndice de la Petición de certiorari, Ira pieza, pág. 345.

 Surge del expediente que el señor Morales envió una carta dirigida a la Sra. Toni Carreon, empleada de Connecticut General Insurance Company, mediante la cual le comunicó su inconformidad en solicitar los beneficios por incapacidad del Seguro Social. Expresamente señaló que únicamente estaba incapacitado para des-empeñarse en el Banco Popular de Puerto Rico (BPPR) como pagador-receptor, fun-ciones especificadas por las recomendaciones médicas. Apéndice del Petición de cer-tiorari, Ira pieza, págs. 166-167.

 Apéndice de la Petición de certiorari, Ira pieza, pág. 165.

 Este informe fue preparado por el Dr. Juan A. Lastra Araeil. La impresión del diagnóstico fue de trastorno obsesivo compulsivo con intromisión pobre y rasgos persecutorios. Se le diagnosticó un Global Assesment of Function Scale (GAF) de *747 55-60 de incapacidad. Apéndice de la Petición de certiorari, Ira pieza, págs. 154 — 160.
El doctor Ifarraguerri explicó durante la vista en su fondo que el GAP esencial-mente mide “la operación global de la capacidad para funcionar”. Continuó expre-sando que para calcularlo se consideran, entre otros, aspectos íntimos, relaciones interpersonales y vocacionales.
Asimismo, añadió que un GAF de 55-60, constituye una pérdida de capacidad para funcionar bastante significativa, lo cual le incapacita para trabajar en las fun-ciones que tenía que desempeñar como pagador-receptor. Sin embargo, ello no impli-caba que no pudiese desempeñarse en otro tipo de trabajo. Transcripción escrita de la vista en su fondo, pág. 55, Apéndice de la Petición de certiorari, 3ra pieza, pág. 1042.

 El reporte evaluativo del Dr. Israel Ganapolsky, médico siquiatra, expresó lo siguiente:
“El Sr. Heberto Morales Bengochea fue entrevistado y examinado en mi oficina el 21 de julio de 1995 para evaluación referido por su patrono Banco Popular de P.R. para autorización de capacidad residual de trabajo.
“De nuestra entrevista surgi[ó] la necesidad de una evaluaci[ó]n siqui[á]trica la cual fue hecha el 30 de julio de 1995 por el Dr. Andr[é]s L[ó]pez Cumpiano, médico psiquiatra, el cual rindi[ó] un informe adjunto.
“Tanto el Dr. L[ó\pez Cumpiano como yo estamos de acuerdo que el Sr. Morales presenta un cuadro de depresi[ó\n mayor de largo tiempo de evaluaci[ó]n que sin duda necesita tratamiento psiqui[a\trico activo y que al presente no estíá] en condi-ciones de trabajar.” (Énfasis suplido.)

 El adiestramiento estaba dirigido específicamente a los cajeros de las sucur-sales, ya que se estaba implementando un nuevo programa de computadoras.

 Apéndice de la Petición de certiorari, Ira pieza, págs. 358 et seq.

 Esto surge del testimonio de la Sra. Carmen Chary Piñeiro Díaz, encargada de reclutamiento de personal, mientras contestaba preguntas relacionadas al proce-dimiento del BPPR en el manejo de vacantes y la solicitud de acomodo razonable del señor Morales. Transcripción escrita de la vista en su fondo, págs'. 107-108, Apéndice de la Petición de certiorari, 3ra pieza, págs. 1094-1095.

 La carta de despido emitida por el BPPR a través de la Lie. Emily Arean, de la División de Recursos Humanos, lee del modo siguiente:
*749 “Estimado señor Morales:
“Habiendo hecho caso omiso a nuestras cartas anteriores, copia de las cuales fueron enviadas a su esposa y su abogado, Ledo. Víctor Bermúdez, le notificamos que se le da de baja como empleado de nuestra institución efectivo el 14 de febrero de 1995.” Apéndice de la Petición de certiorari, Ira pieza, pág. 342.

 Surge del expediente que la Lie. Emily Arian dirigió una comunicación a la Sra. Marta García, esposa del señor Morales, requiriéndole un certificado médico para cubrir el período de la hospitalización del señor Morales.

 1 L.P.R.A see. 501 et seq.

 11 L.P.R.A. sec. 1 et seq.

 29 L.P.R.A. sec. 185a et seq.

 KLAN 199900495.

 Al confirmar esta parte de la sentencia emitida por el Tribunal de Apelacio-nes estamos revocando los remedios concedidos por el Tribunal de Primera Instancia al amparo de estas disposiciones. Estos fueron los siguientes:
a. En lo que respecta a la Ley de Compensaciones por Accidentes de Trabajo, Ley Núm. 45, se le otorgó: el pago de los salarios y beneficios marginales desde la fecha de su despido hasta su restitución, incluyendo los aumentos a los cuales éste se le hubiese concedido de haber estado trabajando para la parte demandada durante dicho periodo, además de la doble penalidad que estatutariamente se dispone proce-dente en estos casos. Se le solicitó a la parte demandada proveer en un término de diez días la información relativa a los aumentos.
b. En cuanto a la' reclamación en daños al amparo del Art. 1802, se concedió la cuantía de $50,000 por daños morales y angustias mentales.
c. En cuanto á los honorarios por concepto de abogados se dispuso que en lugar de un 25%, se concedería una compensación mayor en la partida adicional al 25% de la cuantía de la indemnización concedida al empleado. Para ello se requirió que los abogados presentaran un memorial juramentado de las horas trabajadas y la tarifa base a la cual entienden deben ser compensados.

 29 L.P.R.A. see. 133 et seq.